**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**THE ST. BERNARD PARISH**                    **CIVIL ACTION NO. 24-01952**
**SCHOOL BOARD**
*Petitioner*

**VERSUS**                                     **SECTION L**

**THE BOARD OF COMMISSIONERS**
**OF THE PORT OF NEW ORLEANS**
*Respondent*                                   **MAGISTRATE 5**

_____

*MEMORANDUM IN SUPPORT OF*
*MOTION TO REMAND*
_____

NOW INTO COURT, through undersigned counsel, comes petitioner who respectfully submits the following Memorandum in Support of petitioner's Motion to Remand:

## I.    BACKGROUND OF RELATED CASES

In order to provide a full context of the posture of the instant lawsuit, including the facts underlying the notice of removal, it is necessary to provide the Court with some background information as to at least two of the other lawsuits regarding the LIT facility; namely (1) the *Stop the Destruction of St. Bernard* lawsuit; and (2) the protective order sought by defendants to prevent the public disclosure of the relevant permits and plans

regarding the LIT facility.

### A.    *Stop the Destruction of St. Bernard, Inc. v. Board of Commissioners for the Port of New Orleans*

A coalition of community organizations and residents, filed suit to enjoin the construction of the LIT facility on the basis that the LIT facility would constitute a nuisance and would cause irreparable harm to the citizens of St. Bernard.  The defendants, Port NOLA and the St. Bernard Port, filed various of exceptions, the most relevant of which was an exception of prematurity.  The port defendants argued that the request for injunctive relief was premature as no construction had begun on the LIT project and that the state and federal permit process has not taken place.  As noted on appeal, the defendants claimed that the relief sought by the petitioners therein was essentially an injunction to "enjoin consideration or a proposal or an idea."  On February 2, 2023, the trial court sustained the port defendants' exceptions of prematurity and dismissed the suit without prejudice.  Petitioners appealed the dismissal of the injunctive relief.

In affirming the trial Court's granting of the exception of prematurity, the Court noted that "[a]t the hearing on the exception, the uncontested facts presented to the trial court were that no construction work had begun on the LIT project and that the project had not undergone the permitting process to receive authorization to begin construction." *Stop the Destruction of St. Bernard, Inc. v. Board of Commissioners for the Port of New Orleans*, 2023-CA-0323, p. 9 (La. 10/26/2023), 376 So.3d 982, 987-988.  In a concurring

opinion, Judge Jenkins noted that "[a]t this time, the LIT project is currently only a proposal with no requisite permits to proceed into actual development, and consequently, plaintiffs' allegations of nuisance are speculative and their claims for injunctive relief to prohibit nuisances are premature." *Stop the Destruction of St. Bernard, Inc. v. Board of Commissioners for the Port of New Orleans*, 2023-CA-0323, p. 14 (La. 10/26/2023), 376 So.3d 982, 991.

B.      ***Alora Madere, in her official capacity as the custodian of records for the Board of Commissioners of the Port of New Orleans v. St. Bernard Parish Government, et al.***

On August 4, 2023, St. Bernard Parish Government filed its own lawsuit against the Port of New Orleans seeking, among other things, an injunction to prohibit Port NOLA from operating outside of its territorial jurisdiction and seeking declaratory relief that a number of transactions each constituted an absolute nullity under Louisiana law. On **August 11, 2023**, counsel for St. Bernard Parish Government submitted a number of public record requests attempting to get a better understanding of the proposed LIT facility and to understand where the project was in any permitting processes, including requests for the following[1]:

> (1) All contracts, proposed contracts, requests for bids/proposals, invitation for bids/proposals, solicitation for bids/proposals, including any drafts thereof, related to the proposed Louisiana International Terminal.

...

---

[1] Exhibit 1, page 56

(3) All plans, layouts, and other similar documents of the Louisiana International Terminal.

(4) All applications or permits of any kind related to the Louisiana International Terminal, including any correspondence related to said applications and/or permits.

The response of Port NOLA was to preemptively file a lawsuit against the requesting party seeking a protective order to prevent the disclosure of all of the requested information. See Exhibit 1. On **August 14, 2024**, nearly one year after the requests were made, the trial Court denied the relief requested by Port NOLA. As of the submission of this memorandum, Port NOLA has not responded to any of the requests noted herein.

### C.     RELEVANCE TO THE CASE AT HAND

In *Stop the Destruction of St. Bernard*, it was sympathetically noted that "[t]his Court recognizes the seriousness of the adverse consequences that Appellants alleged could result to St. Bernard Parish residents in the event that the LIT project is permitted to go forward and the Appellants' urgency to take proactive measures to prevent those consequences." *Stop the Destruction of St. Bernard, Inc. v. Board of Commissioners for the Port of New Orleans*, 2023-CA-0323, p. 14 (La. 10/26/2023), 376 So.3d 982, 991. The survey of these other cases highlights the predicament that those concerned about the LIT facility are faced with. Port NOLA broadcasts these massive plans that send the community into a panic. But when the community seeks judicial relief, Port NOLA claims, quite convincingly, that:

Separate and apart from the fact that there's not even been a permitting determination, there's been no work on the property.

...

Here, there's been no construction or any other activity on the property. And for that reason petitioners have failed to state a cause of action in addition to the fact that it's wildly premature.

...

the public is able to be educated and obtain a better understanding of the proposed LIT facility. As previously discussed, Port NOLA has already received feedback and has changed the plans based on that feedback. They are listening, and they are reacting. And this is a collaborative, fluid process that needs to play out.

...

Further to that end, the law simply does not provide a cause of action or relief for anticipatory nuisances which may never occur. None of us know what the project will ultimately look like and to say that it can't go forward under any circumstances is improper.

Exhibit 4, pages 16-18.   February 2, 2023.   Ms. Mastio, Counsel for Port NOLA.

This is not the message being put out to the community or Port NOLA's public and private stakeholders.  Quite the opposite message is being sent to the community and Port NOLA's stakeholders: that this is a done deal.  But when counsel for the affected parties invokes a constitutional right to access public information to better understand the exact posture of this project, Port NOLA seeks to block all access to that public information to have better control of the messaging related to this project.  The instant lawsuit arose as a

result of the irreconcilable conflict of the legal and public relations messaging *as one necessarily proves the other false.*

## II.    FACTS AND PROCEDURAL HISTORY

On **July 8, 2024**, petitioner filed a Petition for a Preliminary and Permanent Injunction in the Thirty-Fourth Judicial District Court for the Parish of St. Bernard claiming, among other things, that the proposed Louisiana International Terminal ("LIT") would constitute an imminent and prohibited public nuisance to the W. Smith Junior Elementary School.  Petitioner sought to avail itself of the extraordinary injunction relief potentially available under Louisiana state law as recognized by the Louisiana Supreme Court in *Salter,* which is discussed in more detail below, while also satisfying the ripeness requirements set forth in *Stop the Destruction of St. Bernard*.

The forty-nine page petition filed by petitioner alleged the facts that run contrary to the legal position maintained by Port NOLA.  On one hand, the legal team has consistently proclaimed that there has been no permitting and no work.  On the other hand, and as alleged in great detail in paragraphs 82-101, the public relations team has consistently presented the contrary: that the plans are finalized and that the commencement of construction is imminent, if not already underway.  On the defendant's website, it notes that construction will begin in 2025.[2]  It is for this reason that the instant lawsuit is categorically different that the *Stop the Destruction of St. Bernard* lawsuit.  The *Stop the Destruction of St. Bernard* lawsuit has been described as seeking to enjoin an

---

[2]  See https://www.louisianainternationalterminal.com/project-development/project-timeline

anticipatory nuisance.  The instant lawsuit more accurately seeks to restrain the repeated and imminent threat of a nuisance.  This distinction is unique to the School because of the immense public relationship campaign revolving around the School with the defendant's ultimate goal being to force the School Board to sell the School site to the defendant.  If the LIT facility is not sufficiently ready for imminent development and that the School is not under any imminent threat, the public deserves to have a firm, judicial declaration as to same to counter the misleading, if not outright false, public relations messaging that has rightfully sent the community into a panic.  It is simply not otherwise possible to counter the defendant's messaging.

Unlike the *Stop the Destruction of St. Bernard* lawsuit, the instant lawsuit is based upon specific and plans published by Port NOLA that plainly, and in the most literal sense, threaten the School site. The specific plans were attached to the petition and for good reason.  These plans reveal that the School is situated almost directly in the center of the "proposed" LIT facility.  See Exhibit 2 and 3.  Phases 1A, 1B, and 2 depict the LIT facility completely enclosing the School on all four sides with absolutely no buffer zone between the School and the LIT facility.  See Exhibit 2.    See also Doc. 1-1, pages 56-58. There is a reason that the plans do not show a buffer zone between the School and the facility: Phase III depicts the LIT facility built *literally* on top of the School site and that the only public highway in front the School has been removed.  See Exhibit 3.  This sounds absolutely unbelievable, but that is what the plans depict and that is what Port NOLA's public relations teams have relayed to the community: the School will not and cannot exist in Phase III.

The petition, specifically paragraphs 82-93, alleges, with great detail, the various land acquisitions made around the School site, but not the School site itself.  Port NOLA has not explained why it did not secure the acquisition of the School before commencing with these plans.  But whatever the reason, the petition alleges in paragraph 9:

> W. Smith, Jr. Junior Elementary School, as a currently operational school, does not and cannot constitute unused or surplus property thereby prohibiting the school board from selling, transferring, or otherwise alienating the W. Smith Junior Elementary School school property.  See generally, La. R.S. 17:87.6 and La. R.S. 41:891.

Port NOLA has not even attempted to refute this brute legal fact.  When confronted with this legal dilemma, the petition alleges in paragraph 101:

> On May 15, 2024 on a publicly broadcast television station, and prior to the filing of the instant lawsuit, the Port of New Orleans, through its Chairman, Walter J. Leger, Jr., admitted as much:
>
> MR. LEGER:
>
> If that can't go forward (sic) then we don't think there's a sound legal basis for the opposition.
>
> But if it can't, ***we (sic) build the terminal around the school which is not a good thing for the school or the kids or the community.***

(Emphasis added).

Rarely is such an admission made by a government official.  As the petition alleges, specifically in paragraphs 94-101, that Port NOLA's public relations messaging created an atmosphere wherein the school board members and parents of the children attending the School of an imminent threat of harm to the students, teachers, and faculty of the

School.  It is believed that Port NOLA had active knowledge that the School could not be legally sold or alienated while in active use.  Port NOLA did not request to purchase the School as it would have probably been illegal to solicit a public official to perform an active specifically prohibited by law.  It is further believed that Port NOLA sought to instill the panic described herein so as to prompt the School Board to request to be bought out by Port NOLA.  And so, some construction activity began within a few hundred feet of the school.  See paragraph 102 of the Petition.

As expected, absolute panic set in, but that panic did not lead to the results desired by Port NOLA.  Instead of requesting to be bought out by Port NOLA, the School Board filed the instant lawsuit.  The petition further alleges, in paragraph 102, that this was a conscious attempt by Port NOLA "to coerce the St. Bernard Parish School Board into relocating W. Smith Junior Elementary..." so that it could be sold to Port NOLA.

As a result of the intentionally induced panic, the instant lawsuit followed and the preliminary injunction was scheduled to be heard in state court on August 21, 2024.  On August 6, 2024, the defendant filed a Notice of Removal claiming federal question jurisdiction on the basis that the relief sought by petitioner necessarily implicates federal issues, namely the permitting under Section 10 of the Rivers and Harbors Act and Section 404 of the Clean Water Act.  In support of the Notice of Removal, the defendant attached a copy of the only permit issued thus far, permit MVN-2021-00270-EG, a testing permit, which is limited to the following:

> Clear for access and spoil/vegetation stockpile areas for geotechnical field exploration activities to include a total of twenty-seven (27) soil borings, sixty (60) Cone Penetration

Tests, and approximately twelve-thousand (12,000) linear feet
of Electrical Resistivity Testing.

No permit has been issued for the construction of the LIT facility and it appears that one could not be issued since Port NOLA has not even submitted the baseline documentation required for its environmental review that would trigger the commencement of the public comment period.  It is believed that this is because whatever might be on file with the USACE is contingent upon the acquisition of the School site to complete the application submission.  ***This bold statement needs some explicit qualification to the Court.  Counsel has made significant efforts to determine whether there has been an actual, completed application for the proposed LIT facility. As noted above, counsel submitted a public records request to the defendant Port NOLA to provide all such applications, permits, and related correspondence.  No responsive documents have been provided to date.  On August 20, 2024, counsel for SBPG in a parallel proceeding, filed a FOIA request with the USACE on behalf of St. Bernard Parish Government to obtain a copy of any facility permit applications.[3]  No responsive documents have been provided to date.  In addition, the defendant did not reference an application number for the LIT facility and did not attach a copy of the facility application package to the notice of removal.***  Moreover, as noted above, the defendant's attorneys have repeatedly the trial Court, appellate Judges, and Louisiana Supreme Court that the exception of prematurity was required to be granted because there were no permits issued yet and even more broadly that the entire concept of the LIT facility has not even crystalized yet (see above, Port NOLA's attorneys exclaimed that

---

[3]  Exhibit 5

"[n]one of us know what the project will ultimately look like".)  As recognized under federal jurisprudence, the defendant bears the burden of substantiating removal.  Yet the defendant has failed to provide the permit application or any related correspondence relating to the actual facility.  One would expect there to be a permit application and plans sufficient to warrant some regulatory review.

It is for these reasons that it seems reasonable to conclude that there is not an actual and completed application for the LIT facility on file with the USACE for the LIT facility.  The only thing that can be confirmed is that the USACE has not issued a draft environmental assessment that would trigger the commencement of the public comment period for the facility permit.  This document, if it existed, would have been published to the USACE New Orleans District website[4] and there is no such document known to counsel.  It is for this reason that any removal based upon a federal question is premature.  While petitioner acknowledges that the LIT facility would ultimately have to go through a review of the USACE, there is no guarantee that the defendant will make it that far given the unsatisfied contingency of its acquisition of the School site.  And from a distance this information should ease any concerns that the School Board may have, but the School issue proves unique because of the relentless public relations campaign by the defendant to sow panic in the community.  The defendant's public relations arm continues to act as if relocation and sale of the School was a given.  The defendant refuses to let up on its public relationship campaign because it needs the School site to build the LIT facility on.

---

[4] https://www.mvn.usace.army.mil/Missions/Regulatory/Public-Notices/

The plans described above appear to explain why Port NOLA has not submitted the required documentation to even ***start*** the process: Port NOLA has not been able to acquire the school and therefore cannot submit final plans to the USACE.  That has not stopped Port NOLA from leading others to believe that construction will commence in 2025 - just four months away.

To conceal this fact, the defendant has attempted to conflate the testing permit, which has been issued, with the facility permit, the application for which has not been completed for submission to and for eventual consideration by the USACE.  As such, the only permit at issue is the testing permit.

The Court need look no further that the testing permit itself to take note that "[t]his permit does not obviate the need to obtain other Federal, State, or local authorizations required by law."  See Doc. 1-3, Page 2, Section 2(b).  The permit itself further states that "[t]his permit does not authorize any injury to the property or rights of others."  See Doc. 1-3, Page 2, Section 2(b).  While the defendant claims that the nuisance claim asserted herein is generally preempted under federal law, in *International Paper Co. v. Ouellete*, 479 U.S. 481, 107 S.Ct. 805, at 815-81, 93 L.Ed.2d 833, the Supreme Court held that a source state's nuisance laws are not preempted under the Clean Water Act.  The defendant makes no mention of this case or the savings clause discussed therein.  It is for these reasons that the Motion to Remand should be granted.

### III.   LAW AND ARGUMENT

All of the background noted above is for the following purpose: to demonstrate

that the defendant is trying to take the claims of the instant lawsuit and try to force fit these claims into the paradigm of a federal question so as to invoke the jurisdiction of this Court.

The instant lawsuit does not seek to invalidate or otherwise challenge the testing permit (permit MVN-2021-00270-EG) or the yet to be applied for facility permit. The instant lawsuit does not seek to *merely* enjoin the activities authorized under the testing permit or the yet to be applied for facility permit and this is, without doubt, a contention that requires requires explanation.

First and foremost, the instant lawsuit seeks to satisfy the ripeness issues set forth in *Stop the Destruction of St. Bernard*. On its face, the petition has done so as the defendant has at least (1) published specific plans upon which petitioner's complaints are based; (2) obtained a testing permit; and (3) commenced with some aspect of construction. Second, the instant lawsuit seeks to enjoin the development and operation of the LIT facility to the detriment of petitioner's property rights. To effectuate that object, the instant lawsuit very broadly seeks to enjoin all construction and construction related activities. Stated alternatively, the instant lawsuit is not merely to enjoin the construction related activities subject to the limited authorization of the testing permit. The anticipated nuisance cannot materialize until such time that the LIT facility is constructed and thus enjoining construction is the most practically effective way of enjoining the operation of the LIT facility. It it self-evident that operating an elementary school inside of a port facility is plainly absurd. That is apparently why the defendant has not submitted its completed facility application to the USACE.

In *Stop the Destruction of St. Bernard*, the Court noted the following:

> Here, in contrast, Port NOLA has not received permits and has not begun construction on the LIT project. The parties do not know when or if the requisite permits will issue. In the event the various agencies permit the LIT project, the final configuration of the project is also presently unknown. Accordingly, the uncertainty as to whether the administrative process will address any, some, or all of Appellants' concerns means the present scope of any judicial controversy is undetermined, and hence, not ripe for judicial review.

> The trial court addressed the above issues in its written reasons for judgment as follows:

> ...

> At the present time, certain property has been assembled for this purpose, but it is undisputed that no actual construction or operation has commenced, and that the project is to first undergo a permitting and review process. This process would include examination, review, including public input, by a number of agencies, including the Department of Environmental Quality, Department of Natural Resources, Department of Transportation and Development, Corps of Engineers, etc., before any permits would be granted or any construction or operations could commence.

> ***This review process has not yet commenced as of the time of this hearing.*** Defendants have therefore filed exceptions, including that of prematurity. Before this Court could accurately determine the merits of plaintiffs' claims, extensive information would have to be compiled and presented, including the evaluations of administrative experts. Further, if Plaintiffs can establish their contentions before the administrative bodies, it is possible that the LIT project would never be permitted or constructed, and this entire litigation would be rendered moot.

> ...

> Hence, the trial court's grant of Port NOLA's prematurity exception is not a ruling on the merits of Appellants' claim

that the catastrophic consequences of the LIT project demand injunctive relief to protect St. Bernard Parish residents. Indeed, the trial court's dismissal without prejudice preserves Appellants' right to re-urge their complaint in the event Port NOLA receives the requisite permits to make the LIT project operational and Appellants allege damages as a result.

(Emphasis added).

See *Stop the Destruction of St. Bernard, Inc. v. Board of Commissioners for the Port of New Orleans*, 2023-CA-0323 (La. 10/26/2023), 376 So.3d 982.

For the specific reasons that follow, petitioner suggests that the underlying dispute does not give rise to federal jurisdiction and that this Court should remand this matter to State Court.

## 1.    *Relevant Law*

As alleged in the petition, in paragraphs 114-130, "Article 667, as one of the 'vicinage' articles, 'establish[es] certain limitations on the scope and extent of the right of ownership in immovable (real) property.' The article is 'an expression of the *sic utere* doctrine that limits the rights of proprietors in the use of their property.' 'The *sic utere* doctrine is an embodiment of the maxim '*sic utere tuo, ut alienum non laedas* '—'use your own property in such a manner as not to injure that of another." Article 667 imposes liability on the proprietor of an estate." *Ictech-Bendeck v. Progressive Waste Solutions of La, Inc., 367 F.Supp.3d 555 (E.D. La. 2019).* In *Inabet v. Exxon Corp.*, 642 So.2d 1243 (La. 1993), the Supreme Court summarized the nuisance doctrine as follows:

Article 667 prohibits uses which cause damage to neighbors or deprive them of the enjoyment of their property, while

Article 668 permits uses which merely cause neighbors some inconvenience. Id. at § 34. Article 669 allows suppression of certain inconveniences, if excessive under local ordinances and customs, and requires tolerance of lesser inconveniences. Together, the three articles establish the following principles: No one may use his property so as to cause damage to another or to interfere substantially with the enjoyment of another's property (Article 667). Landowners must necessarily be exposed to some inconveniences arising from the normal exercise of the right of ownership by a neighbor (Article 668). ***Excessive inconveniences caused by the emission of industrial smoke, odors, noise, dust, vapors and the like need not be tolerated in the absence of a conventional servitude; whether an inconvenience is excessive or not is to be determined in the light of local ordinances and customs (Article 669). Id. At § 34.***

While the nuisances contemplated have not yet materialized, and in fact are not fully knowable for reasons alluded to above, Louisiana law, as noted in *Stop the Destruction of St. Bernard*, recognizes a cause of action for an anticipatory nuisance when "the consequences ... were so serious" as to warrant a qualified injunction. See *Stop the Destruction of St. Bernard, Inc. v. Board of Commissioners for the Port of New Orleans*, 2023-CA-0323, p. 11 (La. 10/26/2023), 376 So.3d 982, 988. See also, *Salter v. B.W.S. Corp., Inc.*, 290 So.2d 821 (La. 02/18/1974), wherein the Louisiana Supreme Court acknowledged that an injunction for an anticipatory nuisance is warranted when "the consequences ... are so terrible that the injunctive relief is appropriate." This is a unique, extraordinary, and sparingly employed form of relief available under Louisiana state law.

2.    ***Argument***

The hearing in *Stop the Destruction of St. Bernard* was held on February 2, 2023. The instant testing permit was apparently issued on March 13, 2023. See Doc. 1-3, p 33. The Court of Appeal issued its opinion on October 26, 2023 and the Supreme Court denied writs on January 24, 2024. Shortly thereafter, some time in May of 2024, Port NOLA commenced construction related activities within a few hundred feet of the School and published specific plans which plainly threaten the very existence of the School. On its face, the prerequisites of *Stop the Destruction of St. Bernard* have been satisfied as it relates to the School. The anticipated nuisance of the LIT facility is categorically different and more specific than the anticipated nuisance claims set forth *Stop the Destruction of St. Bernard*.

As an aside, the sequence of events highlights the gauntlet faced by a community in opposition to the LIT facility. As demonstrated in *Stop the Destruction of St. Bernard*, a suit brought before any permits are issued and before any construction commences, the suit is not sufficiently ripe for adjudication. If suit is not brought until after the $1.8 billion facility is fully constructed, any injunction against the entire facility will be summarily denied as too economically wasteful. At some point there must be some recognition that addressing the specific issues presented in this lawsuit prior to making a $1.8 billion investment is the only prudent course of action. However, the instant suit demonstrates what happens if suit is filed after some permits are issued and after some construction has began: the defendants will seek to conflate state remedies and federal remedies with the hope of forestalling any adjudication.

As was only recently revealed to petitioner after this lawsuit was filed, Port NOLA

has not even submitted the baseline documentation required for its environmental review.

It is reasonable to conclude that this is because the continued School *situs* prevents the

final submission of the desired plans and desired environmental review submissions.  As

such, the commencement of the public comment period has not even begun and frankly

may never begin if Port NOLA fails to actually submit a completed application for

USACE review.  The defendant now seeks to delay adjudication pursuant to *Stop the*

*Destruction of St. Bernard* by conflating state nuisance claims and the yet to be applied

for facility permit.

As to the general law regarding federal question jurisdiction, petitioner cannot

disagree with *Board of Commissioners v. Tennessee Gas Pipeline, et al*:

> A federal court may exercise federal question jurisdiction
> over any civil action that "arises under the federal
> constitution, statutes, or treaties."  A federal question exists
> only where "a well-pleaded complaint establishes either that
> federal law creates the cause of action or that the plaintiff's
> right to relief necessarily depends on resolution of a
> substantial question of federal law."  However, "[t]he fact that
> a substantial federal question is necessary to the resolution of
> a state-law claim is not sufficient to permit federal
> jurisdiction."  Only in a "'special and small category' of
> cases" will federal jurisdiction exist when state law creates
> the cause of action.  That limited category of federal
> jurisdiction only exists where "(1) resolving a federal issue is
> necessary to resolution of the state-law claim; (2) the federal
> issue is actually disputed; (3) the federal issue is substantial;
> and (4) federal jurisdiction will not disturb the balance of
> federal and state judicial responsibilities."

*Bd. of Comm'rs of the Se. La. Flood Prot. Authority v. Tenn. Gas Pipeline Co.*, 850 F.3d

714 (5th Cir. 2017).  However, this standard exists under a larger framework as

acknowledged in *Bihm v. Teche Vermillion Fresh Water District*, 22-01458 (W.D. La.

08/09/22), 2022 WL 18674850:

> A suit is presumed to lie beyond the scope of federal court jurisdiction until the party invoking federal-court jurisdiction establishes otherwise. *Kokkonen v. Guardian Life, 511 U.S. at 377*; *Howery v. Allstate, 243 F.3d at 916*. Any doubts regarding whether removal jurisdiction is proper should be resolved against federal court jurisdiction. *Acuna v. Brown & Root Inc., 200 F.3d 335, 339 (5th Cir. 2000)*. The party invoking the court's subject-matter jurisdiction has the burden of establishing the court's jurisdiction. *St. Paul Reinsurance Co., Ltd. v. Greenberg, 134 F.3d 1250, 1253 (5th Cir. 1998)*; *Gaitor v. Peninsular & Occidental S. S. Co., 287 F.2d 252, 253 (5th Cir. 1961)*.
>
> ...
>
> "[T]he mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction" over a case. *Merrell Dow v. Thompson, 478 U.S. at 813*; *Willy v. Coastal Corp., 855 F.2d 1160, 1168 (5th Cir.1988)*; see, also, *MSOF, 295 F.3d at 491-92* (finding no federal question jurisdiction where "[t]he vindication of ... plaintiffs' rights does not turn on resolution of a federal question."). Furthermore, "the existence of a private cause of action is not a litmus test for the existence of a federal question, as many federal courts had previously held." *Zahora v. Precision Airmotive Corp., 2007 U.S. Dist. LEXIS 17155, 2007 WL 765024, 1 (E.D.Pa.2007)*. Instead, in *Grable & Sons Metal Products v. Darue Engineering*, the United States Supreme Court formulated the relevant inquiry as follows: "does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Products v. Darue Engineering, 545 U.S. 308, 314 (2005)*.

However, a plain reading of these requirements weighed against the broader analytical framework indicates that there is no such federal interest:

- The testing permit explicitly acknowledges that the permittee, Port NOLA, must

comply with all other local, state, and federal laws. See Doc. 1-3, Page 2, Section 2(b) which explicitly states that  "[t]his permit does not obviate the need to obtain other Federal, State, or local authorizations required by law."

- The testing permit explicitly acknowledges that the permit does not authorize the injury to the rights of others.  See Doc. 1-3, Page 2, Section 2(b) which explicitly states that  "[t]his permit does not authorize any injury to the property or rights of others."

- The instant lawsuit does not seek to enjoin the permitted testing activity based on any standard of care or criteria set forth under either the Rivers and Harbors Act or the Clean Water Act.

- The ultimate activity sought to be restrained, i.e. the development and operation of the LIT facility, is not a federally directed activity.

- The ultimate activity sought to be restrained, i.e. the development and operation of the LIT facility, does not even have a fully completed and submitted permit application.

The notice of removal claims that "[t]he Petition directly raises issues of federal preemption and require resolution of substantial questions of federal law, including, but not limited to, the Port's authorizations under existing USACE permits and the ongoing exclusive and statutorily mandated federal permitting process."  Each claim will be addressed in turn.

As to the first claim, the plain language of the permit disclaims preemption over other laws.  Port NOLA has already acknowledged that there is no general federal

preemption at issue here.  In *Stop the Destruction of St. Bernard*, the Court of Appeal explicitly noted that "Port NOLA argued that Appellants' action was premature as no construction had begun on the LIT project and that the state and federal permit process had not taken place."  *Stop the Destruction of St. Bernard, Inc. v. Board of Commissioners for the Port of New Orleans*, 2023-CA-0323, pp. 1-2 (La. 10/26/2023), 376 So.3d 982, 984.  The Court went on to note that "[a]ll of Port NOLA's exceptions emanated from its position that Appellants' lawsuit was premature because the LIT project was only a proposal, emphasizing that the statutory permitting process of various state and federal agencies, along with other administrative remedies pertaining to its approval, had not yet been exhausted."  *Stop the Destruction of St. Bernard, Inc. v. Board of Commissioners for the Port of New Orleans*, 2023-CA-0323, p. 3 (La. 10/26/2023), 376 So.3d 982, 985.  The Court further noted that "Port NOLA emphasized that the permitting process required oversight by various state and federal agencies."  *Stop the Destruction of St. Bernard, Inc. v. Board of Commissioners for the Port of New Orleans*, 2023-CA-0323, p. 14 (La. 10/26/2023), 376 So.3d 982, 988.  At all times prior to the filing of the notice of removal, defendant acknowledged that the project would be subject to various state and federal regulatory frameworks.  Now, the defendant claims that there is federal preemption and that no other state laws may limit any federally permitted activity.

A similar argument was rejected in *Ford v. Murphy Oil USA, Inc.,* 750 F.Supp 766 (E.D.La. 1990) wherein the late Judge Feldman rejected the idea that the Clean Air Act and the Clean Water Act preempt state law claims so as to allow removal on the basis of a

federal question.   Judge Feldman explicitly cited the Supreme Court in doing so: "See

*International Paper Co. v. Ouellete*, 479 U.S. 481, 107 S.Ct. 805, at 815-81, 93 L.Ed.2d

833 (1987) (Clean Water Act did not preempt common law claims of nuisance asserted

by Vermont land owners because state law remedy did not interfere with methods by

which federal statute was designed to reach its goal)."   This rationale and result was

reiterated in *Doerr v. Mobil Oil Corp.*, 2001-0775 (La.App. 4 Cir. 02/27/02), 811 So.2d

1135.

In a much more recent case, *Riehm, et al v. Wood Resources, LLC, et al*, 16-12747,

Section J(3) (E.D. La. 10/20/2016), Judge Barbier summarized and rejected a similar

preemption argument as follows:

> In fact, it was Defendants who raised the issue of federal
> standards, which appears more like the defense of
> preemption. However, "[a] defense that raises a federal
> question is insufficient" to provide jurisdiction. See *MSOF
> Corp v. Exxon Corp.*, 295 F.3d 485, 490 (5th Cir. 2002)
> (citing *Merrell Dow Pharmas., Inc. v. Thompson*, 478 U.S.
> 804 (1986)). Plaintiffs are the masters of their complaint, and
> may choose to allege only state-law claims even where
> federal remedies exist. Id. (citing *Elam v. Kansas City S. Ry.
> Co.,* 635 F.3d 796, 803 (5th Cir. 2011)). Further, simply
> because Defendants may have been in compliance with their
> federal permits does not necessarily mean that they were in
> compliance with state laws and local ordinances. See *Cerny v.
> Marathon Oil Corp.*, No. 13-563, 2013 WL 5560483, at *8
> (W.D. Tex. Oct. 7, 2013) (citing *Bell v. Cheswick Generating
> Station*, 734 F.3d 188 (3d Cir. 2013) (noting that the Clean Air
> Act permits states to impose stricter standards)); see also
> *Gilbert v. Synagro Cent., LLC*, No. 8-1460, 2008 WL
> 4542248, at *2-4 (E.D. Pa. Oct. 9, 2008) (noting that a
> potential federal defense is not a necessary element of a
> common-law tort claim, and merely suggesting that a defense
> may be raised that defendants were in compliance with
> federal regulations does not give rise to federal question

jurisdiction); *Wyatt v. Susses Surry, LLC*, 482 F. Supp. 2d 740, 745 (E.D. Va. 2007) ("Even if Defendants were able to prove compliance with all state a federal regulations, Plaintiffs could still set forth valid claims upon which relief could be granted because the federal Clean Water Act contains a 'savings clause,' which has been construed by the Supreme Court to permit rather than preclude state common-law claims." (citing *Int'l Paper Co. v. Ouelette*, 749 U.S. 481 (1987)).

As a result, the *Riehm* case was remanded to state court. The Court in *Bihm v. Teche Vermillion Fresh Water District*, noted above, followed the same analysis before remanding the case to state court.

As to the second claim, the defendant's re-characterization is not sufficient to change the underlying facts. The defendant claims that this case will "require resolution of substantial questions of federal law, including, but not limited to, the Port's authorizations under existing USACE permits and the ongoing exclusive and statutorily mandated federal permitting process." This argument sounds better when applied to the facility permit, but again, there is no completed facility permit application yet. This allegation attempts to make the instant case appear similar to *Board of Commissioners v. Tennessee Gas Pipeline, et al* and therefore require the same result. However, there is a material difference between the instant case and *Board of Commissioners v. Tennessee Gas Pipeline, et al*: the instant case does not rely upon a duty that does not otherwise exist under state law. In *Board of Commissioners v. Tennessee Gas Pipeline, et al,* the Court made its reasons for upholding federal question jurisdiction clear:

> The absence of any state law grounding for the duty that the Board would need to establish for the Defendants to be liable means that that duty would have to be drawn from federal

law. Supreme Court precedent is clear that a case arises under federal law where "the vindication of a right under state law necessarily turn[s] on some construction of federal law," and the Board's negligence and nuisance claims thus cannot be resolved without a determination whether multiple federal statutes create a duty of care that does not otherwise exist under state law.

The facts of the instant case are diametrically different. As noted above, the instant case is grounded in the duty of one neighbor to another under the nuisance laws and the extraordinary relief recognized under Louisiana Supreme Court precedent in *Salter*. While some of the activities may be subject to federal regulation in one way or another, that argument misses the point. After all, virtually all aspects of daily life are subject in some way or form to federal regulation, i.e. automobile, gasoline, internet, insurance, healthcare. Not everything becomes a federal issue as a result thereof.

It is on this point that the defendant completely misses the essence of the instant lawsuit: there will be an elementary school in the middle of the threatened LIT facility and with *literally* no buffer zone between the two. Phase III shows construction *literally* on top of the entire School site. Petitioner is the titled landowner of the School site and has a constitutional and statutory duty that it discharges through the operation of this School. "Ownership is the right that confers on a person direct, immediate, and exclusive authority over a thing. The owner of a thing may use, enjoy, and dispose of it within the limits and under conditions established by law." La. C.C. art. 477(A). Louisiana Constitution article I, § 4(A) specifically recognizes that "[t]his right is subject to reasonable statutory restrictions and the reasonable exercise of the police power." The threatened LIT facility infringes on the ownership rights of the School Board. The

defendant cannot exercise police power over another state entity and there is no statutory that it relies upon to infringe upon the School Board's rights and duties.

At a minimum, the LIT facility would completely enclose the School on all sides thereby make it usable for the operation of an elementary school. The completed LIT facility would literally block ***all*** public ingress and egress to the School. And as absurd as it sounds, the proposed plans depict the LIT facility literally built on top of and across the entire School site. As such, the LIT facility would necessarily constitute a nuisance under Louisiana law and infringe upon petitioner's vested property rights and specifically the type of nuisance that can be enjoined under *Salter*. Louisiana law affords petitioner the right to seek an injunction to protect its vested property rights. And unlike private property which can be expropriated, it is undisputed that Port NOLA has no ability to expropriate from another political subdivision thereby strengthening the need for injunctive releif.

### IV.    CONCLUSION

As set forth above, the defendant has sought to force fit a purely state law issue into a federal paradigm for the purposes of invoking federal question jurisdiction. The only permit at issue specifically disclaims such preemption, which is in line with the U.S. Supreme Court rejecting a preemption of a source state's nuisance law. As such, there can be no implication of federal law that would warrant the exercise of federal jurisdiction and this Court should remand this matter to state court.

**OFFICE OF THE DISTRICT ATTORNEY**
**FOR THE PARISH OF ST. BERNARD**

**HONORABLE PERRY M. NICOSIA**

BY:   /s/ David C. Jarrell_____
          DAVID C. JARRELL (Bar No. 30907)
          2010 Pakenham Dr.
          Chalmette, LA 70043
          Tel:  (504) 271-1658
          Fax: (504) 279-2874
          djarrell@stbda.org
          Attorney for petitioner SBPSB